IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM D. NATHAN, | : | Civil No. 3:12-CV-00679 |
| Plaintiff, | : | (Judge Mariani) |
| v. | : | |
| TECHTRONIC INDUSTRIES NORTH AMERICA, INC., et al., | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

## I. INTRODUCTION

This is a products liability action brought by Plaintiff William Nathan. Nathan was injured while using a table saw manufactured and sold by Defendants. Presently before the Court is the Defendants' motion for summary judgment. For the reasons set forth below, the motion is granted in part and denied in part.

## II. PROCEDURAL HISTORY

Plaintiff William Nathan commenced this diversity action on April 11, 2012, by filing a complaint against defendant manufacturers, distributors, and retailers. (Doc. 1). Nathan alleges state-law claims for products liability (Counts I, II, V, VI) and breach of implied warranty (Counts III, IV). This Court has subject matter jurisdiction under 28 U.S.C. § 1332. Defendants filed an answer on June 12, 2012. (Doc. 10). On March 18, 2014, defendants moved for summary judgment. (Doc. 31). Supporting materials were filed the same day.

(Docs. 32-35). Plaintiff submitted opposition materials on April 22, 2014. (Docs. 38-43). Defendants filed a reply brief on May 5, 2014. (Doc. 44).

## III. STATEMENT OF UNDISPUTED FACTS

The following statement of undisputed facts is drawn from Defendants' statement of facts (Doc. 32) and the underlying documents. Plaintiff did not dispute any of Defendants' eleven factual assertions. (*See* Doc. 39).

In 2007, Plaintiff William Nathan purchased a Model TS2400-1 table saw that was manufactured, distributed, and sold by the defendants. (Doc. 32, ¶¶ 1, 10). The Model TS2400-1 has a suggested retail price of $399 and weighs 122 pounds. (Doc. 35-1, ¶ 3). The saw came with an operator's manual that contained safety warnings regarding proper use of the saw's blade guard assembly and instructions on how to make rip cuts. (Doc. 32, ¶ 6). The saw itself contained on-product warnings to the same effect. (Doc. 32, ¶ 8). Nathan read that manual several times and was aware of the dangers posed by the saw's rotating blades. (Doc. 32, ¶¶ 5, 7). On June 27, 2011, Nathan was injured while using the saw to make a rip cut through a narrow piece of wood. (Doc. 32, ¶¶ 1-2, 4; Doc. 39, p. 4). At the time of the accident, Nathan was not using the blade guard assembly, which he removed because it interfered with his ability to make narrow cuts. (Doc. 32, ¶ 3; Doc. 39, p. 4).

## IV. STATEMENT OF ADDITIONAL FACTS

The following statement of additional facts is drawn from Plaintiff's Statement of Additional Facts (Doc. 39, pp. 4-8) and the underlying documents.

Defendants had been aware for at least 10 years prior to Nathan's injury that users of table saws often removed the blade guard due to problems with its design. (Doc. 40-1, Peot Dep. I, pp. 25, 61-62; Doc. 40-2, p. 89; Doc. 40-7, p. 53). Removal of the blade guard increases the risk that the user will accidently come into contact with the blade. (Mehler Decl. ¶ 14, 17, Doc. 42; Holt Decl. ¶¶ 30-31, Doc. 43). Even without the blade guard, Nathan's injuries would have been avoided or significantly less serious had the table saw employed active mitigation technology such as flesh detection. (Holt Decl., ¶ 87-114, 204; Gass Decl. ¶ 11, Doc. 41).

In 1999, Dr. Stephen Gass, a physicist, patent attorney, and amateur woodworker, developed flesh detection technology in his garage using materials commonly available at retail electronics stores. (Pl. Stmt. Nos. 6, 7, Doc. 39). The concept relies upon human electrical capacitance: contact with human skin causes a change in the electrical charge running through the blade. (Gass Decl. ¶¶ 4-6). The change in current triggers the release of a compressed spring that pushes a block into the teeth of the rotating blade. (*Id.*). The blade comes to rest approximately three milliseconds after contact and the user typically suffers only a small nick. (*Id.*).

Dr. Gass introduced his technology and a prototype to defendant Ryobi and other manufacturers in 2000. (Pl. Stmt. No. 11). At the time, Ryobi had been aware of the technology but had only conducted limited research due to resource constraints. (Peot Dep., pp. 105-06). In January of 2002, Ryobi licensed Dr. Gass's technology. (Pl. Stmt. No. 12). Instead of proceeding with the license, however, Ryobi formed a joint venture with other table saw manufacturers in May of 2003.[1] (Pl. Stmt. Nos. 13-14). The joint venture developed its own flesh-detection prototype by 2005. (Pl. Stmt. No. 14). Dr. Gass, for his part, formed SawStop, LLC, which developed, produced, and placed on the market a table saw with flesh-detection technology in August of 2004. (Pl. Stmt. No. 16).

## V. STATEMENT OF DISPUTED FACTS

A number of facts are in dispute. First, the parties dispute the existence of certain problems with the "3-in-1" blade guard that came with the table saw. According to Plaintiff, the 3-in-1 blade guard impedes visibility, acts as hindrance for small and narrow cuts, is incompatible with certain cutting operations, and easily becomes misaligned; consequently, users often remove the guard. (Pl. Dep., pp. 31-33, 75, Doc. 34-4; Holt Decl. ¶¶ 17, 30-31, 38; Peot Dep. II 80-81, Doc. 40-4; Mehler Decl. ¶ 12). Once removed, the guard is difficult and time-consuming to replace due to its awkward design. (Holt Decl., ¶¶ 17, 30; Mehler Decl. ¶¶ 4-5, 17). As a result, the 3-in-1 blade guard is seldom used by a significant number

---

[1] David Peot, Ryobi's Director of Engineering, testified that the joint venture was formed to ensure that no single manufacturer would unilaterally adopt flesh detection technology and expose the remaining manufacturers to legal liability. *See* Peot Tr., p. 4-125.

4

of table saw users. (*Id.*). Defendants dispute that the guard is difficult to install by pointing to evidence that Nathan personally had little trouble removing and replacing the device. (Pl. Dep., pp. 43, 62; Doc. 34-2, p. 9).

Second, the parties dispute whether flesh detection technology was technologically and economically feasible for small table saws at the time Nathan's saw was manufactured. Plaintiff contends that it has been feasible since 2002. (Holt Dec. ¶ 195; Gass Decl. ¶ 16). According to Plaintiff, flesh-detection technology is the same for any size saw and could have been incorporated into the type of saw Nathan purchased for approximately $50 to $100. (Gass Decl. ¶¶ 16-18; Doc. 40-18, p. 1239-40; Doc. 40-7, p. 6-161). Defendants, on the other hand, argue that incorporating flesh-detection technology into a small table saw would require an overhaul of the saw's basic design and greatly increase its weight and price. (Otterbein Aff., ¶¶ 3-5, Doc. 35-1). Defendants also point out that SawStop currently sells only industrial cabinet saws, professional cabinet saws, and contractor saws. (Doc. 34-1, ¶ 9). These saws are not comparable to a small table saw due to their vastly greater size, weight, and price. (Holt. Dep., pp. 88-89, 126-27). Defendants further note that if SawStop were to manufacture a small benchtop table saw with flesh-detection technology, the manufacturing cost would be between $250 and $350 and the retail price would be least $700. (Doc. 35, p. 1241). Plaintiff responds by noting that the absence of a small table saw from SawStop's product line is attributable to business decisions and economic constraints unique to a start-up company rather than the feasibility of incorporating flesh detection

technology. (Pl. Addt'l Stmt. Nos. 22; Gass Tr. Test., pp. 2-118 – 2-122; Doc. 35, pp. 908-911).

Finally, the parties dispute whether Nathan would have been injured had he been using the blade guard at the time of the accident. Nathan contends that his hand would have slid under the guard and made contact with the blade. (Holt Decl. ¶¶ 23, 205). Defendants assert that the accident "obviously [would] have been avoided" if the blade guard had not been removed. (Doc. 33, p. 14).

## VI. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 265 (1986).  Once such a showing has been made, the nonmoving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695 (1990). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-

6

movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).

## VII. ANALYSIS

Nathan alleges state-law claims for strict products liability (Counts I & II) and negligence (Counts V & VI); both claims are premised upon a failure to warn theory and three design defect theories. Nathan also alleges claims for breach of implied warranty (Counts III & IV). Defendants seek summary judgment on four different bases. (Doc. 33, p. 2). First, Defendants claim that there was no reasonable alternative design available for any of the alleged design defects. (*Id.* at 2, 6). Second, Defendants argue that Nathan's misuse of the saw caused the accident. (*Id.* at 2, 12). Third, Defendants contend that Nathan cannot prevail on a failure to warn theory. (*Id.* at 2, 14). Finally, Defendants claim Nathan's breach of warranty claims are untimely. (*Id.* at 2, 19). Each issue is addressed in turn.

### A. Counts I, II, V, and VI

#### 1. Design Defect Theories

In a strict products liability action, a plaintiff must show that the (1) product was defective, (2) the defect proximately caused the plaintiff's injury, and (3) the defect existed at the time the product left the defendant's control. *Warnick v. NMC-Wollard, Inc.*, 512 F. Supp. 2d 318, 322 (W.D. Pa. 2007) (citing *Pavlik v. Lane Ltd.*, 135 F.3d 876, 881 (3d Cir. 1998)). To prevail in a negligence action, a plaintiff must plead and prove that the (1) defendant owed a duty of care (2) the breach of which (3) caused (4) damages. *Berrier v.*

*Simplicity Mfg Inc.*, 563 F.3d 38, 61 (3d Cir. 2009). Under either theory, the threshold question is whether the product is in a defective condition. *Warnick*, 512 F. Supp. 2d at 323.

On November 19, 2014, while this motion was pending, the Pennsylvania Supreme Court adopted a new standard of proof to determine whether a product is in a defective condition in strict liability cases. *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 335 (Pa. 2014). Under the approach set forth in *Tincher*, a plaintiff may prove that a product is in a defective condition by showing either that (1) the danger is unknowable and unacceptable to the average or ordinary consumer (consumer expectations test), or (2) a reasonable person would conclude that the probability and seriousness of harm caused by the product outweighs the burden or costs of taking precautions (risk-utility test). *Id.* Under either test, whether a product is in a defective condition is a question of fact to be decided by the jury. *Id.*

This Court is bound to follow the law as determined by Pennsylvania's high court. *Vandenbark v. Owens–Illinois Glass Co.*, 311 U.S. 538 (1941) ("[U]ntil such time as a case is no longer sub judice, the duty rests upon federal courts to apply state law under the Rules of Decision statute in accordance with the then controlling decision of the highest state court."); *Air Products & Chemicals, Inc. v. Hartford Acc. & Indem. Co.*, 25 F.3d 177, 181 (3d Cir. 1994) ("[A] federal court exercising diversity jurisdiction is bound to follow the law as decided by the highest court of the state even if it has changed during the pendency of the federal action."). The court in *Tincher*, however, expressly declined to reach the question of

whether the new standard applies retroactively. 104 A.3d at 410. A threshold question is therefore whether the ruling in *Tincher* applies to this case. The Third Circuit has not addressed the issue.[2] *Cf. Baker v. Outboard Marine Corp.*, 595 F.2d 176, n.19 (3d Cir. 1979) (rejecting argument that Pennsylvania Supreme Court decision in *Azzarello*, which overruled prior products liability law, should not be applied retroactively where court saw "no indication . . . that Azzarello only applies prospectively"). Thus, this Court must determine how Pennsylvania courts would decide whether to apply *Tincher* retroactively to this case. *See Paolella v. Browning-Ferris, Inc.*, 158 F.3d 183, 189 (3d Cir. 1998).

"The general rule followed in Pennsylvania is [to] apply the law in effect at the time of the appellate decision." *Blackwell v. Com.*, 589 A.2d 1094, 1099 (Pa. 1991) (noting that at common law a decision announcing a new principle of law is normally retroactive); *see also McHugh v. Litvin*, 574 A.2d 1040, 1044 (Pa. 1990) ("[T]he general law of our Commonwealth continues to be . . . that our decisions announcing changes in the law are applied retroactively, until and unless a court decides to limit the effect of the change, and that litigants have a right to rely on the change, especially if they have a suit pending in our courts at the time the change is announced."); *Com. v. Cabeza*, 469 A.2d 146, 148 (Pa. 1983) ("[W]here an appellate decision overrules prior law and announces a new principle, unless the decision specifically declares the ruling to be prospective only, the new rule is to

---

[2] In *Williams v. U-Haul Int'l, Inc.*, an unpublished decision, the Eastern District of Pennsylvania applied *Tincher* to an action filed in state court prior to *Tincher* but that was removed to federal court subsequent to *Tincher*. *See generally Williams v. U-Haul Intern., Inc.*, 2015 WL 171846 (E.D. Pa. 2015). That decision did not address the issue of retroactivity.

be applied retroactively . . . ."). The general rule, however, "is not applied rotely." *Passarello v. Grumbine*, 87 A.3d 285, 307 (Pa. 2014). In order to decide whether a decision should have retroactive effect, Pennsylvania courts first determine "whether the decision announced a new rule of law." *Id.* "A decision announces a new rule of law if it overrules prior law, expresses a fundamental break from precedent that litigants may have relied on, or decides an issue of first impression not clearly foreshadowed by precedent." *Id.* at 308. Here, the decision in *Tincher* announced a new rule of law because it overruled prior law regarding the standard of proof and the roles of the judge and jury in strict liability cases. 104 A.3d at 400-01, 406-07.

If a decision announces a new rule of law, Pennsylvania courts "then consider whether (1) retroactive effect will further or hinder the purpose of the new rule; (2) the parties will be unfairly prejudiced because they relied on the old rule; and (3) giving the new rule retroactive effect will detrimentally affect the administration of justice." *Passarello*, 87 A.3d at 307. For reasons set forth below, the three factors weigh in favor of giving *Tincher* retroactive effect.

First, applying *Tincher* in this case furthers the purpose of the new rule. The purpose of the new rule is to define the "defective condition" element of the strict liability cause of action in terms of alternative standards "that are sufficiently malleable to account for product diversity and a variety of legal claims, products, and applications of theory." *Tincher*, 104 A.3d at 408. Applying the new rule retroactively gives the plaintiff greater flexibility to prove

10

that a product was defective and thereby expands the range of products and defects that are subject to strict liability. This furthers the policy underlying the strict liability cause of action.[3] The new rule also provides that whether a product is in a defective condition is a question of fact for the jury. The old rule, by contrast, required the court to balance risks and utilities in order to determine, as a matter of law and policy, whether a product was "unreasonably dangerous." The Pennsylvania Supreme Court concluded that rule was "impractical" and "incompatible with basic principles of strict liability." *Tincher,* 104 A.3d at 380, 406. Applying the new rule retroactively thus relieves the Court from the problematic task of deciding issues of law and policy on the basis of risks and utilities. *See id.* at 381 (""The practical reality . . . is that trial courts simply do not necessarily have the expertise to conduct the social policy inquiry into the risks and utilities of a plethora of products and to decide, as a matter of law, whether a product is unreasonably dangerous.").

Second, the parties will not be unfairly prejudiced because they relied on the old rule. In *Leland,* the Pennsylvania Superior Court rejected a defendant-supplier's argument that *Azzarello* should not be applied retroactively because the defendant had detrimentally relied upon the prior rule. *Leland v. J.T. Baker Chem. Co.,* 423 A.2d 393, 397-98 (Pa. Super. 1980). The court reasoned that "parties do not alter their tortious conduct to conform to the

---

[3] The Pennsylvania Supreme Court explained that policy as follows. "[T]hose who sell a product (*i.e.,* profit from making and putting a product in the stream of commerce) are held responsible for damage caused to a consumer by the reasonable use of the product. . . The risk of injury is placed, therefore, upon the supplier of products. . . No product is expressly exempt and, as a result, the presumption is that strict liability may be available with respect to any product, provided that the evidence is sufficient to prove a defect." *Tincher,* 104 A.3d at 382 (citations omitted).

most recent judicial pronouncements . . . [and] strict liability per the [Second] Restatement is not dependent upon the conduct of the defendant, but rather the condition of the product." *Id.*; *see also Tincher*, 104 A.3d at 368 (citing *Lewis*, 528 A.2d 590 (Pa. 1987)) ("[J]urisdictions with [consumer expectations and risk-utility] approaches agree[] that relevant at trial is the condition of the product rather than the reasonableness of the manufacturer's conduct."). Since under the *Tincher* formulation of the Second Restatement the focus remains upon the condition of the product rather than the conduct of the manufacturer, the defendant could not have prejudicially relied upon the prior rule set out in *Azzarello* and progeny. Analogous considerations apply to the plaintiff. *See Tincher*, 104 A.3d at 369 (quoting *Kimco*, 637 A.2d 603 (Pa. 1993)) ("[I]n strict liability, 'the focus is on the nature of the product and the consumer's reasonable expectations with regard to the product, rather than upon the conduct of either the manufacturer or the person injured.'"). Finally, neither party will be unfairly prejudiced by having the trier-of-fact, rather than the court, balance risks and utilities. *Cf. Passarello*, 87 A.3d at 308 ("[D]efendants . . . did not rely on the "error in judgment" [jury] instruction as a substantive matter of law that alters or modifies the essential standard of care."). Therefore, this factor weighs in favor of retroactive application of the new rule.

Third, giving the new rule retroactive effect would not detrimentally affect the administration of justice. Since this case is in the pre-trial stage, retroactive application of *Tincher* will not result in the costs and delays associated with having to conduct a second

trial. Additionally, as noted above, applying *Tincher* frees the Court from having to expend judicial resources in order to determine, as a matter of law and policy, whether a product is "unreasonably dangerous." Similarly, the new rule clarifies the roles of the judge and jury, clearly articulates the alternative standards of proof, and thereby will likely improve the administration of justice in this case. *Cf. Tincher*, 104 A.3d at 380 (noting that the old rule "did not indicate at which point of the trial the court should consider the question [of risk-utility balancing], nor what pleadings or evidence would be relevant to the inquiry").

For these reasons, the decision in *Tincher* does not represent an exception to the general rule of retroactivity. Therefore, the Court will apply *Tincher* in determining whether the three design defects alleged in the complaint present issues for trial.

### i. *Flesh-Detection Technology*

First, Nathan alleges that the omission of flesh-detection technology constitutes a design defect. (Doc. 1, ¶ 14). The primary issue in this motion thus centers upon whether a benchtop table saw equipped with flesh-detection technology was a reasonable alternative design when the Model TS2400-1 saw was sold. As noted above, the Third Restatement's reasonable alternative design test is not the law of Pennsylvania. Facts pertinent to the cost and feasibility of a safer alternative design, however, are also probative of whether a product is defective under Pennsylvania's risk-utility test. *See Tincher*, 104 A.3d at 389-90. Under that test, a product is defective if a reasonable person would conclude that the

probability and seriousness of harm caused by the product outweighs the burden or costs of taking precautions. 104 A.3d at 335.

Defendants argue that flesh-detection technology was not a feasible alternative design in 2006, the year Nathan's saw was manufactured. (Doc. 33, pp. 11-12). In support of their position, Defendants point out that Dr. Gass's company SawStop currently sells only industrial cabinet saws, professional cabinet saws, and contractor saws, none of which are comparable in size, weight, and price to a small benchtop table saw. (Doc. 32, ¶ 9; Gass Decl., ¶ 9; Holt. Dep., pp. 88-89, 126-27). Aside from that uncontested observation, Defendants' Statement of Undisputed Material Facts is completely devoid of any facts that are probative of the feasibility, cost, and effectiveness of flesh-detection technology. Although Defendants make additional factual assertions in their brief, facts omitted from Defendant's LR 56.1 statement will not be considered in determining whether Defendants have shown that there is "no genuine issue" for trial. M.D. Pa. Local Rule 56.1 ("A motion for summary judgment . . . shall be accompanied by a . . . statement of the material facts . . . as to which the moving party contends there is no genuine issue to be tried."); see also Isbell v. Bellino, 983 F. Supp. 2d 492, 496 (M.D. Pa. 2012) (quoting 772 F.2d 1103, 1110 (3d Cir. 1985)) ("Arguments made in briefs 'are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion.'").

The Court concludes that Defendants have utterly failed to show the absence of a triable issue as to whether the failure to incorporate flesh-detection technology rendered the

14

saw defective under the risk-utility test. In particular, Defendants did not come forward with any facts or evidentiary materials regarding the "probability and seriousness of harm caused by the" table saw. Instead, Defendants only addressed one side of the risk-utility equation, "the burden or costs of taking precautions." Even on that point, Defendants did not demonstrate the absence of a genuine issue. Defendants' sole factual assertion focused upon Dr. Gass's start-up company, SawStop. Yet, Defendants failed to show how the business decisions and manufacturing constraints of SawStop, LLC, relate to the feasibility and cost of implementing flesh-detection technology on a Ryobi, Inc., Model TS2400-1 table saw. *See* Fed. R. Evid. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist."). Thus, the absence of a small table saw from SawStop's product line, without more, in no way demonstrates the absence of factual issues regarding the risks and utilities of flesh-detection technology.

In any event, even if Defendants had met their initial burden as the moving-party, Nathan has come forward with facts and supporting materials that raise a genuine issue as to whether the Model TS2400-1 table saw was in a "defective condition" under a risk-utility test. First, Nathan's experts opined that flesh-detection technology was feasible for small, lightweight table saws. (*See* Holt Dec. ¶¶ 72-79, 95; Gass Decl. ¶¶ 16-18). Although Defendants' expert disagreed, this is a dispute of fact requiring resolution at trial. *See* *Hoffman v. Paper Converting Mach. Co.*, 694 F. Supp. 2d 359, 365-66 (E.D. Pa. 2010)

(explaining that conflicting expert opinions on feasibility of alternative design was not susceptible of resolution at summary judgment stage).

Second, there is a factual dispute as to whether incorporating flesh-detection technology into a small table saw could be accomplished at a reasonable cost. Specifically, Nathan claims that it would cost approximately $50 to add the technology to a benchtop table saw while Defendants point to testimony indicating the cost would be much greater. (Gass Dec. ¶¶ 16-18; Holt Decl. ¶¶ 150, 181). Since Nathan is the non-moving party, we must take his version of contradictory facts as true for purposes of this summary judgment motion, and draw reasonable inferences in his favor. *Scott v. Harris*, 550 U.S. 372, 377 (2007). Doing so here, we conclude that rational jurors could disagree about whether a $50 increase in the manufacturing cost of a saw that would otherwise sell for $400 is an unreasonable cost. Therefore, the cost of incorporating flesh-detection technology, and the reasonableness of that cost, are issues for trial.

Finally, there are factual issues about whether the risk of harm outweighs the cost of implementing flesh-detection technology. Specifically, Nathan has come forward with empirical data regarding the social costs and frequency of table saw accidents and the effectiveness of flesh-detection technology in preventing such accidents. (Gass Decl., ¶¶ 12-14; Holt Decl. ¶¶ 87-116; Holt Report, p. 8). Thus, there is a genuine issue for trial as to whether the "probability and seriousness of harm caused by the product outweighs the burden or costs of taking precautions." *Tincher*, 104 A.3d at 335.

For these reasons, whether the omission of flesh-detection technology constitutes a design defect is an issue for trial.

### ii. *Independent Riving Knife*

Nathan also alleges that the failure to equip the table saw with an independent riving knife constitutes a design defect. (Doc. 1, ¶ 14). Defendants' Statement of Undisputed Facts does not contain any factual assertions relating to the lack of an independent riving knife. That omission alone is enough to deny summary judgment. Even if the Court considers materials referenced in Defendants' brief, summary judgment would still not be appropriate.

Relying on various experts, Defendants argue that a riving knife was not a true alternative design when Nathan's saw was manufactured. (Doc. 33, p. 10; Otterbein Report, p. 8; Holt Dep., p. 28; Holt Report, p. 5). Defendants also contend that a riving knife, which functions to prevent kickbacks in the event the blade guard is removed, would not have been effective given the circumstances of Nathan's accident. (Doc. 33, pp. 10-11; Holt Dep., pp. 19-28). Nathan did not address the lack of a riving knife in his opposition materials. (*See* Doc. 38). Nevertheless, Defendants are not entitled to summary judgment. Even where no opposing evidentiary material is presented, summary judgment should be denied if the materials in support of the motion do not establish the absence of a genuine issue or the moving party's own papers demonstrate the existence of material factual issues. Fed. R. Civ. P. 56, Advisory Committee Notes; *Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 790 (3d Cir. 1978).

Here, the materials relied upon by the Defendants demonstrate the existence of material factual issues regarding an independent riving knife. Defendants cite to the report and deposition of Nathan's expert, Darry Holt. In that report, Holt states that table saws with a separate riving knife have been in use since 1917 and have long been used in Europe. (Holt Report, p. 5). In deposition, Holt testified that a riving knife protects users from kickbacks. (Holt Dep., pp. 16-17). Holt further testified a kickback event "may or may not have occurred" in Nathan's case but that it was "probable" and he could not rule it out (*Id.* at 19-20, 22-23). Finally, Holt testified that a table saw equipped with a riving knife could have been designed to comply with applicable United States standards. (*Id.* at 28-30). Accordingly, the materials cited by Defendants raise factual issues regarding the lack of an independent riving knife. Those issues cannot be resolved on summary judgment.

### iii.  *Blade Guard Assembly*

Finally, Nathan alleges that the absence of a user-friendly blade guard constitutes a design defect because the necessity of removing it for certain cuts combined with the difficulty of reattachment leads many users to permanently remove the guard from the saw. (Doc. 1, ¶¶ 14, 16). In their supporting materials, Defendants point to deposition testimony indicating that Nathan personally had little difficulty installing and removing the blade guard. (Doc. 33, p. 7; Pl. Dep., pp. 43-44, 62, 75-76, 93; Doc. 34-2, p. 9). That testimony also indicates that Nathan had not permanently removed the blade guard at the time of the

accident but instead removed it in order to accurately make a narrow rip cut. (*Id.*).[4]  In

opposing this motion, Nathan presents evidence that the blade guard was problematic and

as a result seldom utilized by table saw owners. (Holt Decl. ¶ 17, 30-31; Mehler Decl. ¶¶ 4-

5, 12, 17). Those problems included interference with the user's visibility and incompatibility

with certain cutting operations. (*Id.*). Nathan testified that he removed the blade guard prior

to his accident because it interfered with his vision while making a narrow cut. (Pl. Dep., p.

76). Therefore, there is a factual dispute regarding problems with the blade guard assembly.

For the foregoing reasons, Defendants are not entitled to summary judgment on the

negligence and strict liability counts with respect to the above three theories of defective

design.

### 2.  Failure to Warn Theory

The complaint alleges that the saw contained inadequate warnings about the

dangers of removing the blade guard and improper safety instructions. (Doc. 1, ¶¶ 22,

33(e)-(g)). Defendants point to the abundance of warnings and safety instructions contained

in the operator's manual and on the saw itself. (Doc. 33, pp. 19-21). In his opposing brief,

Nathan states that he "does not oppose the dismissal of his strict-liability and negligence

claims to the extent they are based on a failure to warn . . . ." (Doc. 38, p. 1 n.1). The Court

interprets Nathan's statement as an agreement to dismiss his failure to warn claims.

---

[4] Again, none of these assertions, other than Nathan's removal of the blade guard, *are found in* Defendants LR 56.1 statement of facts.

Therefore, Defendants are entitled to partial summary judgment on the failure to warn issue with respect to the negligence and strict liability counts. *See* Fed. R. Civ. P. 56(g).

## B. Counts III and IV (Breach of Warranty)

Defendants argue the statute of limitations has run on Nathan's breach of implied warranty claims (Counts III and IV). (Doc. 33, p. 23). In his opposing brief, Nathan states that he "does not oppose the dismissal of his . . . breach-of-implied warranty claims." (Doc. 38, p. 1 n.1). The Court interprets Nathan's statement as an agreement to dismiss Counts III and IV of the complaint. Therefore, Defendants are entitled to summary judgment on Counts III and IV.

## C. Misuse of the Saw

As an affirmative defense, Defendants argue that Nathan's misuse of the table saw was the sole proximate cause of the accident. (Doc. 33, p. 14). In Pennsylvania, "evidence of misuse is generally admissible to defeat causation in a strict liability design defect case." *Moyer v. United Dominion Indus., Inc.*, 473 F.3d 532, 542 (3d Cir. 2007). Misuse involves a plaintiff's "unforeseeable, outrageous, and extraordinary use of a product." *Reott v. Asia Trend, Inc.*, 55 A.3d 1088, 1097 (Pa. 2012). The defendant bears the burden of proving that the use was so unforeseeable or outrageous that it was a sole or superseding cause. *Parks v. AlliedSignal, Inc.*, 113 F.3d 1327 (3d Cir. 1997); *Reott v. Asia Trend, Inc.*, 7 A.3d 830, 836 (Pa. Super. 2010). Since misuse and causation are questions of fact, summary judgment is proper only if the facts are not in dispute. *Summers v. Certainteed Corp.*, 997 A.2d 1152,

1164-65 (Pa. 2010); *Smith v. Yamaha Motor Corp.*, 5 A.3d 314, 321 (Pa. Super. 2010) ("[A]

plaintiff's misuse of a product cannot be grounds for granting summary judgment in favor of

the manufacturer under a design defect theory unless it is established that the misuse solely

caused the accident while the design defect did not contribute to it.").

In this case, Defendants assert that the accident would have been avoided if Nathan

had not removed the blade guard. (Doc. 33, p. 14). In order to prevail on summary

judgment, Defendants must show that there is no genuine dispute that the blade guard

would have prevented the accident. *See Hollinger v. Wagner Min. Equip. Co.*, 667 F.2d 402,

407-08 (3d Cir. 1981) (concluding that genuine issue of fact relating to whether accident

would have been avoided if safety feature not been removed precluded summary

judgment). To that end, Defendants rely on the uncontested fact that Nathan had removed

the guard in contravention of the saw's manual and safety warnings. (Doc. 32, ¶¶ 3, 6, 8;

Doc. 39, pp. 2-3; Doc. 33, pp. 13-14). Nathan responds by noting that Defendants—who

would bear the burden of proving misuse at trial— produced no direct evidence that the

failure to use the blade guard was the sole proximate cause of the accident. (Doc. 38, p.

18). Nathan also produces the opinion of his expert, Darry Holt. (Doc. 38, p. 19). Holt opined

that based on Nathan's angle of approach, Nathan's hand would have slid under the blade

guard and still contacted the blade. (Holt Decl., ¶ 205; Holt. Dep. pp. 66-67). Holt's opinion

raises a triable issue of fact as to whether Nathan's removal of the blade guard was the sole

proximate cause of the accident. Therefore, Defendants are not entitled to summary judgment based on Nathan's alleged misuse of the saw.

## VII. CONCLUSION

Based on the foregoing considerations, Defendants' Motion for Summary Judgment (Doc. 31) is **GRANTED IN PART** and **DENIED IN PART**.  A separate Order follows.

Robert D. Mariani
United States District Judge

22